UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MMG INSURANCE COMPANY,          )
                                )
          Plaintiff,            )
                                )
     v.                         )          2:16-cv-00605-JAW
                                )
PODIATRY INSURANCE              )
COMPANY OF AMERICA,             )
                                )
          Defendant.            )

## ORDER ON MOTION TO DISMISS

An insurance company alleges that, as part of the settlement of an underlying personal injury action, it agreed to split a settlement amount with another insurer, and that the insurers expressly reserved the right to seek recovery from the other based on various coverage defenses. Relying on its reservation of rights and principles of equity, the insurance company filed suit, seeking reimbursement from the other insurer for the portion of the settlement it paid, and claiming that the accident was excluded under its policy and covered under the other insurer's policy. The insurer's lawsuit contains three counts: (1) breach of agreement, (2) equitable contribution, and (3) equitable subrogation.

The other insurer moves to dismiss all of the counts for failure to state a claim. The Court dismisses the equitable contribution count because the doctrine is inapplicable when a party seeks to be relieved of the entire burden of its loss. The Court, however, denies the motion to dismiss the two remaining counts because the

insurance company has pleaded sufficient facts to demonstrate that it may be entitled to recover its portion of the settlement payment from the other insurer, either based on their agreement or on the doctrine of equitable subrogation.

## I.      PROCEDURAL BACKGROUND

On November 10, 2016, MMG Insurance Company (MMG) filed a complaint against Podiatry Insurance Company of America (PICA) in the state of Maine Cumberland County Superior Court claiming it was entitled to be reimbursed by PICA for the amount of its contribution to the settlement in an underlying case. *Notice of Removal* Attach. 3 *Compl.* (ECF No. 1); *Aff. of Braden M. Clement* Attach. 1 *Docket R.* (ECF No. 14). PICA removed the case to this Court on December 7, 2016. *Notice of Removal* (ECF No. 1).

On December 7, 2016, PICA also filed the instant motion to dismiss. *Def.'s Mot. to Dismiss* (ECF No. 5) (*Def.'s Mot.*). On December 27, 2016, MMG filed an amended complaint. *Am. Compl.* (ECF No. 17). On the same day, it responded to PICA's motion to dismiss. *Pl.'s Resp. to Def.'s Mot. to Dismiss* (ECF No. 18) (*Pl.'s Opp'n*). PICA replied on January 10, 2017, moving to dismiss both the Complaint and Amended Complaint. *Def.'s Reply in Supp. of its Mot. to Dismiss* (ECF No. 25) (*Def.'s Reply*).

## II.     THE AMENDED COMPLAINT

As an initial matter, the Court addresses the amendment of the complaint after PICA filed its motion to dismiss. Under Federal Rule of Civil Procedure 15(a), a party "may amend its pleading once as a matter of course within . . . 21 days after service

of a motion under Rule 12(b)." FED. R. CIV. P. 15(a)(1)(B).  MMG properly did so on December 27, 2016, twenty days after PICA filed its motion to dismiss under Rule 12(b)(6).

In its opposition to the motion to dismiss, MMG explained that "[a]lthough [it] does not believe its complaint is legally deficient, it has filed an Amended Complaint as a matter of course pursuant to Rule 15(a)(1)(B) that more clearly sets forth the multiple bases upon which MMG is entitled to assert its claims against PICA." *Pl.'s Opp'n* at 1 n.1.  Specifically, MMG added three counts to the Amended Complaint not explicitly stated in the original Complaint: Count I–Reapportionment/Contribution by Agreement, Count II–Equitable Contribution, and Count III–Equitable Subrogation. *See Am. Compl.* at 3–6.  MMG also added details concerning the alleged agreement and settlement payment: MMG alleges it expressly reserved its rights to seek recovery from PICA and MMG further alleges that its settlement "payment was not made as 'volunteer', but rather as an insurer against whom claims were asserted." *See id.* ¶¶ 8–9, 13, 19.

Typically, this amendment would render the pending motion to dismiss moot. *See Cate St. Capital Inc. v. Indus. Intelligence Inc.*, No. 1:14-cv-00200-JDL, 2014 U.S. Dist. LEXIS 171548, at *2 (D. Me. Nov. 17, 2014), *adopted by* 2014 U.S. Dist. LEXIS 170629 (D. Me. Dec. 10, 2014) ("Because Plaintiff's amended complaint is now the operative pleading, Defendants' response to the original complaint (i.e., the pending motions to dismiss) is moot").  However, in its motion to dismiss, PICA anticipated potential claims, including the claims for equitable contribution and subrogation that

MMG added in its Amended Complaint, and PICA addressed those claims in both its motion to dismiss and reply. It would be futile to dismiss PICA's motion without prejudice, only to have PICA refile another motion to dismiss with effectively the same arguments. As the later amendment of the Complaint does not affect the substance of the pending motion to dismiss, the Court considers the Amended Complaint as the operative complaint for purposes of the motion. *See Edson v. Riverview Psychiatric Ctr.*, No. 1:16-cv-00079-JAW, 2017 U.S. Dist. LEXIS 27808, at *3 n.1 (D. Me. Feb. 28, 2017).

## III. THE ALLEGATIONS IN THE AMENDED COMPLAINT[1]

MMG is an insurance company organized under the laws of the state of Maine with authority to transact the business of insurance in the state of Maine. *Am. Compl.* ¶ 1. PICA is an insurance company authorized to conduct business in the state of Maine that issues professional liability insurance policies in the state of Maine. *Id.* ¶ 2.

On or about May 15, 2013, William Dickson, now deceased, visited his podiatrist Peter Ocampo, DPM, for treatment of his foot, specifically to perform a debridement procedure. *Id.* ¶ 3. Debridement is a medical procedure involving the removal of dead, damaged, and infected tissue to improve the healing potential of the remaining healthy tissue. *Id.* ¶ 4. During the visit, Dr. Ocampo wheeled Mr. Dickson's wheelchair adjacent to a footrest of the treatment chair. *Id.* ¶ 5. Dr.

---

[1] Consistent with First Circuit authority, the Court accepts as true the well-pleaded allegations in the Amended Complaint and draws all reasonable inferences in the pleader's favor for purposes of the motion. *See Román-Oliveras v. P.R. Elec. Power Auth.*, 655 F.3d 43, 45 (1st Cir. 2011).

Ocampo lifted Mr. Dickson's foot approximately six to ten inches off the footrest of the wheelchair, at which time the wheelchair flipped over backwards causing Mr. Dickson to hit his head on the floor (the accident). *Id.*

The Estate of William Dickson commenced a civil action against Dr. Ocampo in Cumberland County Superior Court with Docket No. CV-15-491 (the Civil Action) for injuries sustained in the accident. *Id.* ¶ 6. Both MMG and PICA agreed to provide Dr. Ocampo with a defense subject to a reservation of rights. *Id.* ¶ 7. A mediation of the Civil Action took place on June 2, 2016; both MMG and PICA participated in the mediation despite a coverage dispute between PICA and MMG. *Id.* ¶ 8. MMG and PICA could not resolve their coverage dispute at the mediation but agreed to settle the claims in the Civil Action by making equal contributions to the settlement, with each insurer reserving the right to seek recovery from the other based on the various coverage defenses. *Id.* ¶ 9.

MMG had issued a Businessowners policy to Southern Maine Foot and Ankle, P.A. with Policy No. BP20936155 that was in effect at the time of the 2013 accident. *Id.* ¶ 10. The MMG insurance policy contained an exclusion for professional services that reads in part:

> j.  Professional Services
> "Bodily injury", "property damage", "personal and advertising injury" caused by the rendering or failure to render any professional service. This includes but is not limited to:
> (4)  Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;
> (5)  Any health or therapeutic service treatment, advice or instruction;

     (6)     Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming.

*Id.*

PICA had issued a professional liability policy to Dr. Ocampo and Southern Maine Foot and Ankle, P.A. with Policy No. 1PD0014194 that was in effect at the time of the 2013 accident. *Id.* ¶ 11. The PICA insurance policy provided coverage for liability arising out of the provision of "professional services" with the term "professional services" being defined as:

    **III.**   **DEFINITIONS**
    (o)    "**Professional services**" means the providing of medical services, including medical treatment, diagnosis of disease or surgical intervention. It shall also include acting as a member of a recognized accreditation committee, peer review committee or like body, or the rendering of expert opinions about the propriety of care as long as the subject of the opinion is within the scope of practice of the person rendering such an opinion.

*Id.*

## IV.   THE PARTIES' POSITIONS

### A.   PICA's Motion to Dismiss

First, PICA moves to dismiss any claim for equitable subrogation[2] alleging that "the action is barred by the voluntary payment doctrine." *Def.'s Mot.* at 2. It argues

---

[2]    PICA also moved to dismiss the complaint arguing that MMG "fail[ed] to identify any cause of action as the basis for its lawsuit against PICA." *Def.'s Mot.* at 2 (emphasis in original). As already discussed, MMG filed an Amended Complaint as a matter of course pursuant to Rule 15(a)(1)(B) that "more clearly sets forth the multiple bases upon which [it] is entitled to assert its claims against PICA." *Pl.'s Opp'n* at 1 n.1. Because the Court concludes that the Amended Complaint is the operative complaint for purposes of this motion, the Court views this ground for dismissal as moot.

that because MMG paid a portion of the settlement even though it contends its policy excluded coverage for Dr. Ocampo, it made a voluntary payment. *Id.* at 2–3.

Second, PICA moves to dismiss any claim for equitable contribution. *Id.* at 3. PICA distinguishes the doctrines of equitable contribution and equitable subrogation and states that "the aim of equitable contribution is to apportion a loss between two or more insurers who cover the same risk, so that each pays its fair share and one does not profit at the expense of the others." *Id.* (citing 16 COUCH ON INSURANCE § 222:98 (2016)). PICA asserts that "MMG does not contend that both it and PICA covered the same risk, and MMG is not seeking reapportionment of the settlement amounts paid by it and PICA" and therefore PICA argues that MMG does not state a cause of action for equitable contribution. *Id.* at 3–4. Additionally, PICA claims that the cause of action for equitable contribution, like that for equitable subrogation, is barred by the voluntary payment doctrine. *Id.* at 4 n.1.

Finally, PICA argues that the complaint is barred by virtue of a settlement agreement and release. *Id.* at 4. Relying on *Butters v. Kane*, 347 A.2d 602 (Me. 1975), PICA argues that "because there is no language in the Release expressly reserving the right of any party, including MMG, to proceed with a subrogation action for the amounts paid," MMG is barred from making an equitable subrogation claim, or for that matter, any claim. *Id.* at 4–5.

## B.     MMG's Opposition

In response, MMG states that "PICA in its motion to dismiss completely ignores the express allegation in Paragraph 8 that both PICA and MMG made the

contributions to settlement reserving their rights to seek recovery from the other based on various coverage defenses." *Pl.'s Opp'n* at 4. It claims that this allegation "constitutes an express statement of an agreement between the parties to resolve the coverage issues at a later time in order to effectuate what both parties believed was a reasonable settlement on the merits of the underlying case." *Id.*

Additionally, MMG disputes PICA's interpretation of what constitutes a voluntary payment and argues that "the term 'volunteer' does not include every party involved in contested litigation who ultimately is determined at the conclusion of the litigation to not have a liability." *Id.* at 4–5. It argues that PICA's "overly rigid interpretation of what constitutes a 'volunteer' directly contradicts the strong public policy favoring settlement of disputes." *Id.* at 5.

MMG also states that "[a]n insurer that pays a loss is equitably subrogated to the claims possessed by its insured to recover amounts from another responsible party." *Id.* at 6. It says that "either insurer could have settled the case with its own funds and become equitably subrogated to Dr. Ocampo's claims against the other insurer if in fact the other insurer was the sole carrier providing coverage." *Id.* It further argues that the voluntary payment doctrine fails in this context for the same reason it fails in the equitable contribution context. *Id.* at 7.

Lastly, MMG argues that PICA's release argument is an affirmative defense and not a proper matter for a motion to dismiss when the release document is not a part of the pleadings or necessary to any claim being asserted. *Id.* It submits that the Court should not consider the release but that if it does, it should also consider

the extrinsic evidence submitted by MMG. *Id.* Additionally, MMG distinguishes the cases relied upon by PICA stating that "[n]either PICA nor MMG were parties to the underlying case that was settled and was the subject matter of the release." *Id.* at 8. It states that the release is between Dr. Ocampo and the Estate of Dickson and that it is not seeking its equitable subrogation claim against the Estate of Dickson, and therefore the release does not apply. *Id.* It argues that instead the express agreements and statements made between PICA and MMG during the mediation control. *Id.* at 9–10.

### C. PICA's Reply

In reply, PICA maintains that MMG has no viable cause of action for contribution by agreement because, it argues, there is "no allegation that MMG and PICA made an express agreement to litigate allocation or indemnification of the settlement amounts outside of whatever rights might exist under common and/or statutory law." *Def.'s Reply* at 1–2. It claims that MMG and PICA are "both sophisticated insurers who were represented by counsel at the mediation" and that "MMG has not pled that the insurers or their counsel executed any sort of 'agreement' to support a Contribution by Agreement claim." *Id.* at 2.

Additionally, PICA argues that MMG has not stated a cause of action for equitable contribution because equitable contribution involves the apportionment of a loss and here, MMG is seeking to shift the entire loss to PICA. *Id.* PICA also argues that the equitable subrogation claim fails because Dr. Ocampo, "after being fully indemnified by having MMG and PICA pay the settlement on his behalf, and after

releasing all claims in the Confidential Settlement Agreement and Release, has no rights or claims against PICA to which MMG is subrogated." *Id.* at 3. Essentially, PICA argues that "MMG has no 'shoes' to step into." *Id.* at 3–4.

## V.    LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Under the general pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the United States Supreme Court elaborated on this pleading standard in the context of a motion to dismiss: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The First Circuit explained that "[t]he plausibility inquiry necessitates a two-step pavane." *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citing *Rodríguez–Reyes v. Molina–Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Id.* (quoting *Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct

alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

## VI. DISCUSSION

In the Amended Complaint, MMG alleges three counts against PICA: Count I–Reapportionment/Contribution by Agreement; Count II–Equitable Contribution; and Count III–Equitable Subrogation. PICA argues that MMG is barred from bringing any action against it based on the Settlement Agreement and Release in the underlying action and that MMG fails to state a claim with respect to each of the counts.

### A. PICA's Affirmative Defense

PICA raises an affirmative defense that MMG's claims are barred by the Settlement Agreement and Release executed in the underlying action, which it attaches to its motion. *Def.'s Mot.* at 4–5; *Confidential Settlement Agreement & Release* (ECF No. 21) (*Settlement Agreement*). MMG urges the Court not to consider the Settlement Agreement and Release, arguing that its consideration is not proper at this stage. *Pl.'s Opp'n* at 7.

It is well established that affirmative defenses may be raised in a motion to dismiss an action for failure to state a claim. *Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 197 (1st Cir. 2001) (collecting cases). However, "it is equally well settled that, for dismissal to be allowed on the basis of an affirmative defense, the facts establishing the defense must be clear 'on the face of the plaintiff's pleadings.'" *Id.* (quoting *Aldahonda–Rivera v. Parke Davis & Co.*, 882 F.2d 590, 592 (1st Cir. 1989));

*see also Santana–Castro v. Toledo–Dávila*, 579 F.3d 109, 113–14 (1st Cir. 2009). If the movant introduces documents outside the pleadings to validate its defense, the Court may only consider the extraneous material by converting the motion to dismiss into a motion for summary judgment, and it may only do that if it gives the parties "a reasonable opportunity to present all the material that is pertinent to the motion." *Rivera v. Centro Médico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (quoting FED. R. CIV. P. 12(d)). At the same time, the First Circuit recognizes a narrow exception "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Alt. Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

The Settlement Agreement and Release meets the *Alternative Energy* tests. Even though MMG does not explicitly refer to the Settlement Agreement and Release in its Amended Complaint, nor does it attach the document to its Amended Complaint, MMG implicitly refers to the agreement when it alleges that both insurers participated in the mediation and agreed to make equal contributions to the settlement amount, reserving the right to seek recovery from the other. *See Am. Compl.* ¶¶ 8, 9. The Court infers from the allegations in the Amended Complaint that the alleged agreement between MMG and PICA led to the ultimate Settlement Agreement and Release signed in the underlying action. *Id.* ¶ 9 ("MMG and PICA could not resolve the dispute between them with respect to the coverage issues, and therefore agreed to settle the claims asserted in the Civil Action by making equal

12

contributions to the settlement, with each insurer reserving the right to seek recovery from the other based on the various coverage defenses"). Moreover, PICA's liability in the present action depends on the circumstances surrounding the settlement in the underlying action and the Settlement Agreement and Release appears central to the resolution of these issues. Finally, although MMG disputes the relevance of the Settlement Agreement and Release to its claims, it does not appear to dispute the document's authenticity. Therefore, the Court will consider the Settlement Agreement and Release for purposes of this motion since it meets the *Alternative Energy* tests of authenticity, centrality, and sufficient reference.

The Court will also consider the affidavit and correspondence submitted by MMG concerning the mediation and alleged agreement to reserve the right to seek recovery because these documents are central to MMG's claims. *See Decl. of James D. Poliquin* (ECF No. 19); *id.* Attach. 1 *Letter from Mark D. Lefkow to James D. Poliquin* (June 6, 2016).

Turning back to PICA's affirmative defense, the allegations and documents considered "must 'leave no doubt' that the plaintiff's action is barred by the asserted defense." *Blackstone Realty LLC*, 244 F.3d at 197. In the Court's view, PICA has failed to meet this standard. The Release in the underlying action states:

> The Undersigned hereby releases, acquits, and forever discharges the Released Parties from all claims and demands of whatever nature, whether arising under tort or contract theories or any federal, state, or local law, actions and causes of actions, damages, punitive damages, costs, loss of service, attorneys' fees, cost of litigation, humiliation, embarrassment, physical and emotional pain and suffering, medical expenses, mental anguish, injury to reputation, claims for wrongful death, and money benefits or compensation of any kind on account of or

13

in any way growing out of personal injuries, property damage, and/or death having already resulted or to result at any time in the future, whether or not they arise following the execution of this Release, as a result of and by reason of the Occurrence. The Undersigned acknowledges that there may be more serious damages or injuries as a result of the Occurrence than may now appear or than may now be known.

*Settlement Agreement* at 2. The Agreement defines the "Undersigned" to include "John Dickson, as personal representative of the Estate of William Dickson, on behalf of him, his heirs, assigns, agents, and anyone else acting on his behalf, and Yvonne Dickson." *Id.* at 1. It defines the "Released Parties" to include "Peter Ocampo, D.P.M., and all corporate affiliates, parents, subsidiaries, officers, directors, servants, agents (actual or apparent), employees, shareholders, attorneys, insurance carriers (past, present and future and irrespective of type of insurance, including professional liability, general liability, or otherwise), predecessors, successors and assigns, and ALL OTHER PERSONS, FIRMS, ASSOCIATIONS, PARTNERSHIPS AND CORPORATIONS, that are or might be claimed to be liable to the Undersigned as a result of the Occurrence." *Id.*

As MMG points out in its opposition, this Settlement Agreement and Release concerns all claims as a result of the accident that may arise between the Estate of Dickson on the one hand and Dr. Ocampo, and anyone else who might be liable for the accident, on the other. In consideration for the payment by Dr. Ocampo (which came from PICA and MMG as the insurers), the Estate of Dickson released Dr. Ocampo and all others liable as a result of the accident. Although "insurance carriers" are among the parties released by the Estate of Dickson, it does not follow

14

that the release extends to the claims between MMG and PICA arising out of the settlement.

The cases on which PICA relies in order to make its argument that MMG's action is barred by this release deal with different facts and call into play different policy concerns. In *Butters v. Kane*, 347 A.2d 602 (Me. 1975), the Maine Supreme Judicial Court addressed a lawsuit arising out of an accident, where two snowmobiles struck each other. *Id.* at 602. Robert Butters operated one of the snowmobiles on which Beverly Butters, his wife, was a passenger; Peter Kane operated the other snowmobile. *Id.* Beverly Butters filed suit against Mr. Kane and Mr. Kane impleaded Mr. Butters as third party defendant. *Id.* at 602–03. Ms. Butters settled her claim against Mr. Kane and as part of the settlement, both Mr. and Ms. Butters executed a release, absolving Mr. Kane "from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature whatsoever." *Id.* at 603. After the settlement, Mr. Kane continued to proceed against Mr. Butters for his proportional responsibility for the settlement amount. *Id.* A jury attributed thirty-percent of the liability for Ms. Butters' damages to Mr. Butters. *Id.*

Mr. Butters appealed the jury verdict on the ground that the settlement barred Mr. Kane's claim for contribution from Mr. Butters. *Id.* The Maine Supreme Judicial Court explained that in the state of Maine "the term 'all causes of action' used in the usual form of general release is sufficiently broad to include the right of contribution unless such right of action for contribution is expressly excepted from the terms of the release." *Id.* at 603 (citing *Norton v. Benjamin*, 220 A.2d 248, 251 (Me. 1966)).

The *Butters* Court acknowledged that Mr. Kane, who had pursued the contribution action against Mr. Butters, had not signed the settlement release. *Id.* Nevertheless, the Maine Law Court held that, absent an express reservation of rights, the making of a settlement "constitutes complete accord and satisfaction of all claims of immediate parties to the settlement arising out of the same accident." *Id.* at 604.

In explaining its decision, the *Butters* Court quoted extensively from *Lugena v. Hanna*, 420 S.W.2d 335 (Mo. 1967), a Supreme Court of Missouri case. *Butters*, 347 A.2d at 604. As the Maine Law Court noted, in *Lugena*, the Missouri Supreme Court discussed the following overriding policy concern: that by settling a claim, a party has made "an express or implied admission of negligence on his part." *Id.* (quoting *Lugena*, 420 S.W.2d at 341). The Missouri Supreme Court explained that the law will not generally allow a party "to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him." *Lugena*, 420 S.W.2d at 341. Thus, unless there is express language restricting the release, "it must be concluded that the instrument was contemplated and intended to be a complete settlement of all matters between the parties to the release" and that "estoppel, in its purest form, . . . rests simply on a rule of law which forecloses one from denying his own expressed or implied admission which had in good faith been accepted and acted upon by another." *Id.*

The rationale underlying the *Butters* rule applies, as the *Butters* Court was careful to note, only to the "immediate parties to the settlement." *Butters*, 347 A.2d

at 604.  The Maine Law Court subsequently reiterated this limitation.  In *Brown v.*

*Manchester*, 384 A.2d 449 (Me. 1978), the Maine Law Court wrote:

> *Butters v. Kane* laid down a carefully circumscribed rule binding a release only if he is an "immediate party" to the release.  We see no persuasive reason for expanding that rule to any named releasee.  Such expansion would go beyond any rationale for the rule.

*Brown*, 384 A.2d at 453.

In *American National Fire Insurance Company v. York County*, 582 F. Supp. 2d 69 (D. Me. 2008), *aff'd* 575 F.3d 112 (1st Cir. 2009), a United States District Judge in Maine rejected an argument similar to the one PICA is pressing.  The underlying case in *American National* involved a class action arising out of strip searches conducted without reasonable suspicion by York County of arrestees who had not been convicted of a crime.  582 F. Supp. 2d at 72.  The Maine County Commissioners Association Risk Pool (the Risk Pool) was York County's insurer and it defended the underlying lawsuit under a reservation of rights.  *Id.*  While the underlying action was pending, the Risk Pool identified two other insurance carriers who may have provided coverage for York County, one of which was American National, and those insurers participated in a coordinated defense of York County.  *Id.* at 73.  After a series of mediations, the Risk Pool, American National, the third insurer, and York County all agreed to contribute to a settlement of the class action lawsuit.  *Id.* at 76.  The Court approved the class action settlement and a settlement agreement was signed, releasing York County and American National as well as the other insurers. *Id.* Following completion of the settlement, American National filed suit against York

County to collect proceeds that it contended were due under the American National insurance policy. *Id.* 78–79.

Among other defenses, York County raised *Butters v. Kane*, arguing that the settlement of the class action without an express reservation of rights constituted complete accord and satisfaction of all claims. *Id.* at 80 n.6. The district court firmly rejected York County's argument, noting that the Maine Law Court had made it clear that the *Butters* rule applied only to the immediate parties to the settlement agreement. *Id.* The *American National* Court conceded that both York County and American National were included as releasees but concluded that they were still not immediate parties to the settlement, and that "[t]hese differences place this case outside the *Butters* rule." *Id.*

As *Butters*, *Brown*, and *American National* suggest, the *Butters* rule is expressly limited to the parties to the settlement. In addition, as this case demonstrates, to hew to a narrow interpretation of *Butters* would be consistent with the public policy concerns that underpin the *Butters* rule. Here, the resolution of the coverage issue between MMG and PICA is wholly unrelated to the merits of the underlying action, and therefore the *Butters* estoppel concern of the parties taking inconsistent positions is not applicable. Furthermore, a public policy that allows disputing insurers to make a separate peace with the claimant and to later resolve their insurance dispute would facilitate, rather than discourage settlement. For example, as in *Butters*, it hardly benefits the injured party to wait to resolve a claim against a tortfeasor until the tortfeasors' insurers formally resolve a coverage issue.

On the other side of the lawsuit is, of course, the insurers' own insured, Dr. Ocampo, and here the insurers apparently settled the lawsuit within Dr. Ocampo's coverage limits and avoided exposing his personal assets to a verdict in excess of coverage. To deliberately infuse the coverage dispute into the settlement of the claim within coverage would have been problematical. Nor is it practical to force the insurers to insert their agreement to separately resolve the coverage dispute into the release that the injured party executes to discharge the tortfeasor.

In short, the Court does not view *Butters* and its progeny as a bar to MMG's lawsuit against PICA.

## B.   Count I: Reapportionment/Contribution by Agreement

In Count I, MMG brings a claim for "Reapportionment/Contribution by Agreement." *Am. Compl.* at 3. PICA argues that this claim fails because MMG has not alleged that MMG and PICA made an express agreement to litigate allocation or indemnification outside of whatever rights might exist under common and/or statutory law. *Def.'s Reply* at 1–2. The Court disagrees. In paragraph 13 of the Amended Complaint, MMG explicitly states that "MMG and PICA contributed to the settlement under the *express agreement* that each insurer was reserving its rights to recover some or all of any amounts paid by it towards the settlement based on the various coverage defenses asserted by each insurer." *Am. Compl.* ¶ 13 (emphasis supplied); *id.* ¶ 9 ("MMG and PICA could not resolve the dispute between them with respect to the coverage issues, and therefore agreed to settle the claims asserted in the Civil Action by making equal contributions to the settlement, with each insurer

reserving the right to seek recovery from the other based on the various coverage defenses").

PICA seems to be suggesting that because there is no allegation of a writing, there can be no agreement. *See Def.'s Reply* at 2 n.1 ("In the instant case, there is no writing of an express agreement to proceed with litigation outside of any rights that are available at common or statutory law. The only written document is the Confidential Settlement Agreement and Release (previously filed with this Court) which contains no language setting forth an agreement to litigate between MMG and PICA").

PICA would have a plausible argument if the Settlement Agreement and Release were the only alleged agreement. At this stage, the Court does not need to resolve whether MMG could successfully introduce evidence of an oral supplement to the written agreement. *See, e.g.*, *Brown Dev. Corp. v. Hemond*, 2008 ME 146, 956 A.2d 104; *Burrowes Corp. v Read*, 116 A.2d 127, 129–30 (Me. 1955). This is because MMG's Amended Complaint effectively alleges two separate agreements: (1) the written Settlement and Release Agreement signed by the Estate of William Dickson and Yvonne Dickson in favor of Dr. Ocampo and others, and (2) an oral side agreement between MMG and PICA that the coverage issue would be resolved after the Estate of Dickson settlement was finalized.

Whatever might be said in the future about the ultimate success of MMG's theories, they are not susceptible to dismissal because the Court must accept as true the allegations in the Amended Complaint. Furthermore, at the motion to dismiss

stage, MMG need only state a plausible claim for relief. *See Iqbal*, 556 U.S. at 678.

It has done so by alleging that MMG and PICA made an express agreement to reserve

the right to seek recovery from each other based on coverage defenses. PICA's motion

to dismiss Count I is denied.

### C. Count II: Equitable Contribution

The doctrine of equitable contribution has long been recognized in the state of

Maine. *Bragdon v. Worthley*, 153 A.2d 627, 631 (Me. 1959). It requires that "when

parties assume a common obligation, those parties must share equally that obligation

and burden." *Daigle Commercial Grp., Inc. v. St. Laurent*, 1999 ME 107, ¶ 26, 734

A.2d 667; *see also Ins. Co. of Pennsylvania v. Great N. Ins. Co.*, 787 F.3d 632, 635 (1st

Cir. 2015). Maine has not definitively addressed whether equitable contribution is

available to support a claim for contribution by one insurer against another, but the

First Circuit has addressed the issue generally:

> In the insurance context, the right to contribution arises when several
> insurers are obligated to indemnify or defend the same loss or claim, and
> one insurer has paid more than its share of the loss or defended the
> action without any participation by the others . . . Equitable contribution
> permits reimbursement to the insurer that paid on the loss for the excess
> it paid over its proportionate share of the obligation, on the theory that
> the debt it paid was equally and concurrently owed by the other
> insurers.

*Lexington Ins. Co. v. Gen. Accident Ins. Co. of America*, 338 F.3d 42, 49 (1st Cir.

2003); *see also Ins. Co. of Pennsylvania*, 787 F.3d at 635.

In MMG's claim for equitable contribution it states that "[b]ecause the liability

of Dr. Ocampo for the injuries to William Dickson are within the coverage of the PICA

policy and excluded by the MMG policy, MMG is entitled to equitable contribution

against PICA in the amount of MMG's contribution to the settlement with the Estate of William Dickson." *Am. Compl.* ¶ 20. Essentially, MMG argues that it was not required to indemnify Dr. Ocampo under its policy and that PICA was the only insurer with an obligation. The problem with this theory is that the doctrine of equitable contribution applies when parties "assume a common obligation" and requires those parties to "share equally that obligation and burden." *Daigle*, 1999 ME 107, ¶ 26, 734 A.2d 667. The doctrine does not apply where one insurance company is seeking to be relieved from the entire loss. *See* 15 COUCH ON INSURANCE § 217:5 ("*Unlike contribution*, subrogation and indemnity can relieve an insurer or surety of the entire burden of the loss") (emphasis supplied); *id.* § 218:3 ("[W]here insurers cover separate and distinct risks there can be no contribution among them"). Because MMG is claiming that it has no obligation at all and seeking complete reimbursement for its payment to Dr. Ocampo, the doctrine of equitable contribution is inapplicable. The motion to dismiss is granted with respect to Count II.

### D.  Count III: Equitable Subrogation

MMG's claim for equitable subrogation stands on different footing. Maine recognizes the doctrine of equitable subrogation and under the Maine rule, it may arise by contract or by operation of law. *Home Ins. Co. v. Bishop*, 34 A.2d 22, 23 (Me. 1943). The Maine Supreme Judicial Court has stated that equitable subrogation is "a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it." *Nappi v. Nappi Distribs.*, 1997 ME 54, ¶ 8, 691 A.2d 1198 (quoting *United Carolina Bank v. Beesley*, 663 A.2d 574, 576 (Me.

1995)).  It is "the substitution of one person in place of another, whether as a creditor

or as the possessor of any other rightful claim, so that he who is substituted succeeds

to the rights of the other in relation to the debt or claim and its rights, remedies or

securities." *Associated Hosp. Serv. of Maine v. Me. Bonding & Cas. Co.*, 476 A.2d 189,

190 (Me. 1984).  It is "a concept derived from principles of restitution and unjust

enrichment." *Nappi*, 1997 ME 54, ¶ 8, 691 A.2d 1198 (citing *North East Ins. Co. v.

Concord Gen. Mut. Ins. Co.*, 433 A.2d 715, 719 (Me. 1981)).  The doctrine requires

that the equities of the parties be weighed and balanced.  *Beesley,* 663 A.2d at 576.

"Subrogation, itself a creature of equity, must be enforced with due regard for the

rights, legal or equitable, of others.  It should not be invoked so as to work injustice,

or defeat a legal right, or to overthrow a superior or perhaps equal equity, or to

displace an intervening right or title."  *Id.* (citing *Fed. Land Bank of Springfield v.

Smith*, 151 A. 420, 422 (Me. 1930)).  Unlike a claim for contribution, subrogation can

relieve an insurer of the entire burden of the loss, which is what MMG seeks to do in

this case. *See* 15 Couch on Insurance § 217:5.  However, PICA argues that MMG is

barred from making a claim for subrogation because of the voluntary payment

doctrine.

A party is not entitled to subrogation when "he voluntarily or officiously

satisfies another's obligation, under no legal or moral obligation to do so or with no

interest of his own to protect." *Nappi*, 1997 ME 54, ¶ 8, 691 A.2d 1198 (quoting *North

East Ins. Co.*, 433 A.2d at 719).  The Maine Law Court has stated that the term

"volunteer" should be "narrowly and strictly interpreted to allow liberal application

of the doctrine of subrogation, and that any doubt as to the applicability of the exception should be resolved against the existence of volunteer status." *Id.* Additionally, the Maine Law Court reasoned that "one is not a volunteer if he pays 'under a mistaken belief that he had an obligation to pay or interest to protect.'" *Id.* (quoting *North East Ins. Co.*, 433 A.2d at 719); *see also* RESTATEMENT (FIRST) OF RESTITUTION § 162 (1937). Also, one may not be a volunteer if he is protecting economic interests or taking action under the threat of litigation. *Nappi*, 1997 ME 54, ¶¶ 11, 12. Here, MMG alleges that its payment "was not made as 'volunteer', but rather as an insurer against whom claims were asserted." *Am. Compl.* ¶ 19. It is reasonable to infer from this allegation, and the allegation that MMG reserved its right to seek recovery from PICA, that MMG made payment to the settlement amount not as a volunteer but to avoid litigation on the underlying claim and to settle it at a reasonable amount.

In its reply, PICA also argues that because Dr. Ocampo has been fully indemnified by having MMG and PICA pay the settlement on his behalf and has released all claims in the Confidential Settlement Agreement and Release, he has no rights or claims against PICA to which MMG is subrogated. *Def.'s Reply* at 3–4. The Court disagrees. It is true that subrogation is the "substitution of one party for another" and that MMG, as subrogee, steps into the shoes of Dr. Ocampo. *See Me. Mun. Emps. Health Tr. v. Maloney*, 2004 ME 51, ¶ 7, 846 A.2d 336. It is also true that "[t]he party subrogated acquires no greater rights than those of the party for

whom he is substituted." *Leavitt v. Canadian Pac. Ry. Co.*, 37 A. 886, 888 (Me. 1897) (quoting *Jackson Co. v. Boylston Mut. Ins. Co.*, 2 N.E. 103 (Mass. 1885)).

However, as already discussed, the release in the agreement is between Dr. Ocampo and the Estate of Dickson and does not extend to claims brought by Dr. Ocampo against its insurers, neither of which was a signatory nor an immediate party to the Settlement Agreement and Release. More importantly, MMG alleges that the insurers reached an oral agreement to resolve the coverage issue and the concept of equitable subrogation is likely broad enough to capture PICA's refusal to acknowledge its resolution agreement in view of the fact that MMG paid one-half of the Dickson settlement on behalf of MMG and PICA's mutual insured.

The point of equitable subrogation is to place responsibility on the entity responsible and that right is not necessarily eliminated by payment or full indemnification. In fact, the doctrine of equitable subrogation often applies after a claim has been paid; the idea is that the claim has been paid wrongfully, as MMG asserts here. *See North East Ins. Co.*, 433 A.2d at 719–20 (holding that insurance company stated a plausible claim for equitable subrogation when it asserted that it discharged liability under a mistaken belief and that another insurance company was primarily liable). The motion to dismiss Count III is denied.

## VII.  CONCLUSION

The Court GRANTS in part and DENIES in part PICA's Motion to Dismiss (ECF No. 5). The Court GRANTS PICA's motion as to Count II and DENIES PICA's motion as to Counts I and III.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 18th day of April, 2017